Case No. 12-1342, Utility Air Regulatory Group Petitioner v. Environmental Protection Agency Mr. McFredrin for Conservation Group Petitioners Mr. Rave for Respondent EPA Mr. Flynn for Industry and State Intervenor Respondents Mr. Fitchthorn for Industry and State Petitioners Mr. Rave again for Respondent EPA And Mr. McFedrin again for Conservation Group Intervenors Respondents Good morning. May it please the Court. Charlie McFedrin for Conservation Group Petitioners. I'd like to reserve one minute of my time for rebuttal. Today we will focus our presentation on two issues in which EPA acted unlawfully and arbitrarily. First, EPA failed to examine emissions at the state or sub-regional level when making the comparison between best available retrofit technology and the transport rule and failed to rationally respond to comments about this issue by federal land managers. Second, EPA failed to set best available retrofit technology, or BART, in the manner demonstrated by statute and failed to rationally respond to comments demonstrating this presumptive level of BART was weaker than statutory BART, than BART under the Clean Air Act, for many sources. First, EPA committed legal error in failing to consider a sub-regional or state-level approach. EPA's approach to BART looked at 48 states, and BART under the statute is determined at the state level. Can you focus your remarks on how you would, in making that argument, get around our UARG decision where we faced that issue and, I thought, specifically rejected the notion that the aggregate across the geographic areas was inadequate? There are a couple of levels to that, if I may. First, each alternative to BART, we believe, has to be judged on its own merits. CASPER, the current transport rule, is not the same as CARE. It covers a wider geographic area. It has more extended timelines. EPA, in fact, in its rulemaking, had a section of its Federal Register Notice that described all the differences between CASPER and CARE. In terms of the averaging approach, we believe that the regulation provides EPA with the flexibility to look at 48 states, basically nationwide in 48 states, or to look at a state-level or sub-regional approach. That approach was highlighted by the federal land managers and their comments to the record of this rulemaking. The federal land managers stressed a state-level approach first, and there's a powerful table in the BART service comments that shows for eight states west of the Mississippi River how the transport rule compares to BART and how the emissions are lower in that eight-state region for BART than they are for the transport rule. The states that really jump out for us are things that aren't even in our own comments, but they're in that federal land manager comment about Kansas and Nebraska in the National Park Service comments, where there are big sources of air pollution that impact national parks in those states that will have essentially no controls under the transport rule, whereas if an effective level of BART was applied to those sources, we'd see benefits at parks like Wind Cave, Theodore Roosevelt, and Badlands in the Dakotas, parks that are impacted by those sources. And the other one I want to mention is Texas. EPA, just before this one. Right, I appreciate those aspects of the record, but I'm looking at our decision, and it's the, I guess, second-to-last paragraph of our 2006 UR decision that says, nothing in the HASE Act's reasonable progress language requires at least as much improvement in each and every individual area as BART itself would achieve. An EPA's requirement of some improvement at all areas, coupled with no degradation at any area on the best days, appears a reasonable notion of reasonable progress. So the aggregate is enough as long as there is no area-specific degradation, and I take it that means degradation from existing, not degradation as compared to BART. Well, we believe it is as compared to, and that's consistent with EPA's own regulation in 51-308-E3. As compared to BART? As compared to between the alternative. The alternative program that EPA is proposing as compared to BART. We also, we view the failure here, Your Honor, as a multipronged failure. So we've identified 14 national parks that do worse under the transport rule, and those are identified in our plan. Than they would under BART, not than they are. Correct. Than they would as a comparison, as EPA itself has set up the test in E3. We also look at the EPA's action regarding the presumptive levels of BART and the failures that we see in presumptive levels of BART that we've identified in our brief, including things like failure to identify smaller sources, failure to address the statutory factor of remaining useful life. I was just going to say that I follow your argument, and when I first read 51.308-E3, I read it the way you were just proposing, lack of degradation compared to BART in every class one area. But I think, and my panelists and counsel today will correct me if I'm wrong, I think we have read that, and EPA reads it to mean lack of degradation compared to the status quo, in which case, and we've approved that reading. And so my question is really a question not about the logic of your reading on its own terms, but against the backdrop of where we are given our precedent. Well, it's the language, for us, fundamentally it's the language of the statute. Yes. Come back to the language of the statute. Which is remedying any existing impairment of visibility. And talks about states. Yes. And uses words like source when talking about BART and how BART should be applied. I think the language that I'm looking at is in sort of the preamble to the part of E3 that's before little one and little two. And there's language there about comparing the two alternatives. And when you look at that language as animated by the statute, we think it's important for EPA to make that comparison with reference to the statutory factors. And EPA's guidelines acknowledge that source-specific BART under the statute is still relevant and still vital even when there's a presumptive BART standard to apply. Can I just ask you, you mentioned the useful life issue. Yes. And suppose we were to find that the EPA response to the comments on that was not very thorough or clear. If that were the only flaw, would we have to remand the matter for clarification of that under Generate, I suppose? We think that that's indicative of wider failures by EPA to address the five factors. We do think the remaining useful life is an example that Your Honor has identified that jumps out at us because it's a statutory effect. Do you have an answer to the argument that the government made in its brief, which as I interpreted was essentially that the situations where it cuts one way and the situations where it cuts another way, it's fundamentally impossible to make a clear calculation as to which will do what when. Fundamentally, EPA didn't make that argument on the record. I agree. In terms of addressing the substance of what the government offers post hoc rationalization, it's important because it animates how EPA evaluates controls of a source. A source may be dirty and may be closing next year, so it may not make economic sense. And BART is an economic in part calculation about plants. It may not make economic sense to insist. I think I understand the trade-offs, but is not every reason to expect that EPA would say exactly what its lawyers have said? We think that would be a useful dialogue to engage in because we think that it's part. Yes, we would like to see that remand. We would like to see that discussion as part of a remand, and we expect that the remand would cover broader issues as well. Thank you. That's what the red means. Good morning, Your Honors. Norman Ray from the Department of Justice on behalf of EPA. Let me address the two issues that the petitioners have raised, the first having to do with the subdivision. The EPA's regulations, and this is the same analysis EPA did in the UR case, but the regulations allow EPA to determine that an alternative is superior to BART, better than BART, if it achieves average improvement over BART, average resources. And that's exactly what it did here. But, Mr. Ray, what about the portion that opposing counsel pointed to? If just preceding in the Federal Register the announcement of the standard, the visibility should not decline and there should be overall improvement. If the distribution of emissions is not substantially different. Just to be clear, the thing that strikes me as unusual about the Hayes rule is it really is geographically specific. And so the point is, yes, if you have a program or a statutory requirement for air quality that is basically rendered superfluous by another air quality program, then it seems like the substitution makes perfect sense. Why require all kinds of compliance with machinery when you have a trading program under a different authority? When you're dealing with average air quality, that is sort of the end of the matter. But here we have this visibility rule, which is very geographically specific. So the notion that's saying, well, on average. Well, Your Honor, it's not on average for emissions. It's on average looking of the different sites. Visibility. Visibility at the particular site. So EPA does do the first part of the analysis. This is a modeling exercise to compare BART versus the transport rule. And the first part is to assign what the emissions are going to be from the various facilities. So the BART facilities, they use either the presumptive limits or they use if the specific facility had a limit, it would use that limit. The second step is to say, use a model that calculates which facilities are going to run. The integrated planning model that we've used in a number of rulemakings that says, okay, we're going to get. We know under these circumstances which facilities are going to run how much. Then it calculates emissions based on that. And then it calculates what the results on visibility will do at each Class I area. And for each Class I area, what the modeling analysis shows first, it's not going to get any worse than it is currently,  the only logical interpretation of the regulation, because otherwise it would make the second prong superfluous. The second prong is the comparison between BART and the alternative. The first prong of the test is, does the alternative make it worse anywhere? So that is an independent prong, and that's what that prong is. The second prong is, and that is the regulation. And, Your Honor, that regulation is long past time for review. It has been on the books. The application of that regulation to a very similar program in care was upheld by the court in Newark. And what EPA found was that, on average, every sort of, and almost, I think there may be one Class I area where there isn't, where the transport rule doesn't do better on either the best or worst states. So it does have improvement across the board. Plus, EPA did, first of all, the Forest Service comments that petitioners are talking about were not public comments, Your Honor. Those were comments that were submitted to OMB during the interagency process that petitioners acquired through a FOIA. So they're not in the public docket. They are specifically excluded from the record for judicial review by Section 307B of the Act. And I don't even know whether EPA ever saw them because they were submitted to OMB. OMB then transmits some kind of summary. So the fact that EPA did not explicitly respond to them is due to their, how they came into the agency, and they are, in fact, not by statute part of the record for judicial review here. And the agency did explain two things. It did get to, obviously, the petitioner's comments, and there were comments from DOI. It responded to both of those on the record, and it explained that, number one, this is fully compliant with the regulations. The petitioners don't really contest because the regulations specifically allow improvement if it's better, if it achieves improvement on average. And as Your Honor pointed out, that was explicitly found in the UR decision by the court before. And they pointed out that because Passport World is a regional program and it affects over 26 states or however many states that EPA was modeling, it makes sense to evaluate its impact by looking at it regionally as opposed to breaking up the state into regions, which the petitioners never really defined how EPA was supposed to do that, how we were supposed to break it up into regions. And it said, plus it pointed out that the federal land managers- The Transport Rule is a regional program. The Transport Rule is a regional program. Right, but the Hays, the visibility is not regional. That's correct, Your Honor, but in order to know what sources are going to do under the Transport Rule, you have to look at it on a regional basis and determine whether the Transport Rule, which is a regional approach, which has been upheld, is effective. You have to look at it onto the whole region to know what it's doing. And it is certainly consistent with the regulations. Plus, the statute has other provisions. BART is only one part of the requirements that states have to meet. There are two other things to consider. One is it's part of the overarching requirement that state SIPs achieve reasonable progress, so that if a state uses the Transport Rule and isn't achieving reasonable progress that affected Class I areas, it has to do more. Secondly, federal land managers have the option of designating a source as what's called RAVI, Reasonable Attributable Visibility Impairment. And in fact, they mentioned Kansas, or Nebraska, excuse me, which is one of the large sources in Nebraska, has been so designated, and the state has to address that issue. So there are other ways, and EPA did address this and comment. I know my time's up, but could I address Judge Williams' question about the... Useful life. I'm sorry? Useful life. Yeah, useful life. First of all, useful life was raised in about two sentences. It was very succinct. So it was very, very succinct. It was not a major comment. It certainly, I don't believe, warrants even remand to explain it, and I believe the agency has adequately explained it. It certainly explained it in its briefs, and it was referred to in the... And that it simply doesn't... There's no way... The premise here is that, well, if a facility's going to shut down, but they haven't demonstrated that the facility's going to shut down under BARC, that it wouldn't shut down otherwise. It's going to have the same impact. In other words, there's no analysis by petitioners other than these two sentences saying, well, you didn't really think about this, to show that it would have made the slightest bit of difference in the analysis. Because what the usual tradeoff is... No, but they're saying that if you're calculating for purposes of emissions trading, you're calculating an anticipated level of emissions, and you look at some of these older, dirtier plants, and you model them as if they're going to be online in perpetuity, then you're setting the sort of reasonably achievable level higher than you would be if you realized that under BARC on a real-life, case-by-case basis, a lot of those would go offline and emissions would be lower. That's how I take the argument to run. But they haven't shown any... First of all, all BARC facilities are old facilities. Right. BARC, by definition, only applies to facilities... Exactly, so that only makes the argument stronger, doesn't it? Except that they haven't shown that there's going to be any significant difference in when these facilities would shut down under BARC as opposed to... No, they don't need to, though, because their theory is just, what is your formula, and is your formula accurate? Because BARC is not a formula, they don't need to show it with respect to that. They need to say, does your formula match what would happen if you weren't relying on a formula but were relying on retrofitting requirements? First of all, the usual tradeoff is they have higher emissions for each... A facility that's going to shut down has higher emissions for a period of time and then shuts down. So it goes both ways. But I think what they're saying is if you're modeling, if technology is generally getting better, trending better, then you're modeling based on making a model that's supposed to stretch over time that has unrealistically generous assumptions in it. I mean, that's what I take their point to be. I don't think there's any basis to say that's an unrealistically generous assumption because they haven't put any evidence forward to do that. And do you have another argument? Again, these plants are all over 40 years old. So they've been around a long time, and there's no compelling reason. Some of them may shut down, but it's not clear at all how it would affect the modeling because if they're going to shut down under BARC, they might very well shut down for other reasons. If they're going to shut down for other reasons, it's not going to affect the results. They may shut down, but it leaves the allowances that you're putting into the trading market at a higher level than they would otherwise be because that's the way the alternative functions, right? There are allowances. The allowances are the same, but it's not going to change the emissions per se. It will still be the same level of emissions. They'll just get redistributed to other facilities. Exactly. I think that's their point. But again, they didn't put out any evidence. They didn't put out anything to indicate that it's going to be a significant issue. It's raised in two sentences kind of offhandedly in their comments and not raised to the level that requires a more substantive response. Are there any questions? Thank you. May it please the Court. I'm Aaron Flynn. I'm here on behalf of the State and Industry Intervenor Respondents, and I would like to address two jurisdictional issues that we describe in our brief that don't occur in the other briefs. EPA's decision to use the presumptive BART limits as the basis for its BART benchmark was entirely consistent with its rules in place for a considerable length of time. The 1999 BART rule allowed consideration of category-wide information. The presumptive limits clearly fall or qualify as category-wide information. And in 2006, EPA promulgated a rule that specifically determined that the presumptive limits are an appropriate tool for developing a BART benchmark when evaluating a BART alternative like the Cross-State Air Pollution Rule. The challenges here before this Court today are effectively challenges against the 2006 rule and are therefore barred by 307B1. The Tenth Circuit addressed this very issue and reached that conclusion in a case called Wild Earth Guardians v. EPA. The same petitioners who are environmental petitioners in this case presented that argument there and for that additional reason they should be precluded from raising that issue before this Court. Contrary to the reply... But there's an environmental petitioner here that wasn't present in the Tenth Circuit case, right? So there's not a preclusion problem under Taylor v. Sturgill. There's perfect alignment between the environmental petitioners in these cases and in the Tenth Circuit cases. Oh, I thought there was a party here that wasn't there. None on the environmental petitioner side, at least. The reply brief says these issues have been waived. They have not been waived. Jurisdictional issues obviously cannot be waived. This Court has held many, many times that 307B1 is a jurisdictional matter and nothing has undermined that holding. I see my time is up, so if there aren't any further questions, thank you for your time. Thank you very much, Mr. Friend. Just a couple of quick points, Your Honors. In terms of the number of Class I areas that do worse as between the two alternatives, we've documented that it's 14 areas. That's in our brief at page 39 and in the joint appendix at pages 69 to 71, 069 to 071. In terms of the regions and whether regional alternatives were offered, the option to look at this at the State level is always before EPA. That's the way the statute is written. In fact, that's the way EPA's own region is written. What about Mr. Ray's point that any kind of backsliding or failure to make reasonable progress at a particular area is taken account of through other aspects of BART in the SIP? Other aspects of BART? If there's a more localized problem, then the SIP is required to tighten up the requirements beyond the transport rule. Well, BART is the heart of the HAYS program. Applying good technology at individual sources is how we get the best HAYS benefits. We don't support, we would consider a fallback program, some other program that might pick up something like reasonably attributable visibility impairment that might pick up a problem later on. But what we really want is for BART to be well applied at each individual source. And in terms of the regions and whether we offered a regional approach, the federal land managers suggested this Mississippi West region, this eight-state region, and they offered detailed emission data about how that region would do better, including the states I mentioned before, Kansas, Nebraska, and Texas. But apparently not in the administrative record? They are in the record. They're in the Joint Appendix. The U.S. Forest Service comments were submitted by us as an attachment to our comments. So they are in the record. I wanted to mention that too. Thank you. May it please the Court, my name is Norman Fickthorn, counsel for the Utility Air Regulatory Group here on behalf of industry and state petitioners. EPA's disapproval of carry for BART SIFs should be vacated because EPA lacked any rational basis for rejecting state plans that relied on carry emission reductions. Emission reductions that the agency concluded were lasting emission reductions and that this Court held actually produced better visibility improvement than BART. In fact, far better, the Court said in U.R. v. EPA. Far better improvement than BART in terms of visibility. EPA acknowledged that carry produced permanent and enforceable emission reductions that are better than BART at improving visibility. These are not fleeting or transitory or ephemeral emission reductions. But Mr. Fickthorn, that's not really the question for us, right? The question for us now is if the transport rule is the emissions trading program, the authority for the emissions trading program in place, how could you graft some levels permitted under the prior rule under care and use those in the other program? It just seems like apples and oranges. Judge Pillard, we don't take the position that EPA needs to resurrect care itself. Right, but just give you the allowances that were calculated under care. Not the allowances, Your Honor, not the emission allowances under the care program itself, but simply recognize that when states relied on the carry emission reductions, they were acting appropriately under the BART regulations that existed at the time and this Court's decision in U.R. v. EPA in 2006. The actions that EPA took in 2012 to disapprove the care equals BART SIPs were actions taken at a time when care was fully in effect and states had to comply with those reductions. And EPA, moreover, said in its brief on page 58 that care had resulted in the installation of control devices that reduced emissions and because care was being replaced by CASPER, which was a more stringent program, not a relaxation of care. Those reductions, those care reductions were permanent and enforceable. And EPA, moreover, said again... I thought the most dramatic part of your brief was the contrast between your states and Connecticut. But there does appear to be a distinction between them in terms of the status of care under decisions of this Court at the respective times of the decision on your states and the decision on Connecticut using care. Judge Williams, I think the argument for EPA having acted unlawfully in disapproving the care equals BART SIPs that we're talking about is even stronger in light of the differences that existed in 2012 when EPA took those actions and in 2014 when EPA approved Connecticut's care equals BART SIP at a time... Our Court had changed its view of care, right? We were wrong. That's just... that's built into the record. So that care, although at best on life support throughout this whole period, was doing better at the point where the Connecticut decision was made. I think care was doing worse at that time, with all respect, Your Honor, because at the time EPA submitted its approval of Connecticut's care equals BART SIP in July 2014, submitted it to the Federal Register, the Supreme Court had reversed this Court's vacature of CASPER. So it was clear at that time. And, in fact, EPA had already moved this Court to lift the stay of CASPER, which, of course, this Court shortly thereafter granted. In other words, CASPER was being revived at the time, at the very time EPA was approved, finalizing approval of the Connecticut care equals BART SIP. So EPA took an action on the Connecticut care equals BART SIP that we think is perfectly in line with the conclusion that the care emission reductions were permanent and enforceable, as EPA has said dozens of times in the Federal Register, even saying it as recently as January of this year, long after... They said it's permanent? Permanent and enforceable, Your Honor. That suggests that they couldn't impose stricter requirements under the transport rule. It doesn't necessarily suggest that they couldn't impose stricter requirements under the transport rule. They did indeed do that. But they never have retracted or disavowed their statements. In fact, they've repeated their statements, even as early as January of this year, that the care emission reductions were permanent and enforceable, essentially locked in. Those emission reductions under care were locked in under CASPER, which was a more stringent program. Right. But, I mean, it makes sense that it would sort of be a one-way ratchet. To the extent that the law and the courts are requiring the EPA to go further, they're saying, well, don't abandon what you're doing under care, and then let's establish and finalize the legality of the transport rule, and, okay, that's demanding a bit more. And I guess I don't see the illogic of EPA saying, okay, now everyone has to do the bit more. And, of course, the states that were subject to CASPER did more, but that doesn't negate or undermine the emission reductions that were achieved through the installation of control devices, as EPA said, under care. But it doesn't necessarily render them adequate either, does it? It renders them adequate for purposes, Your Honor, of the BART alternative. That's what we're talking about here. This court held unqualifiedly in utility air regulatory group versus EPA in 2006 that care produced visibility improvement that was far greater, not just greater, but far greater than BART. But if care is dead, which seems to be the case, then the trading program of which the EPA binding was, which was the support of the EPA binding, disappears, right? Your Honor, I don't think it disappears at all. I think it stands. In fact, in a way it's strengthened because CASPER was more strengthened than care, and no one disputes that. EPA said repeatedly CASPER produces more emission reductions. So you can view CASPER as care plus. If care was enough to satisfy BART, then CASPER is even more, if you will, enough to satisfy BART. As a practical matter, what would a decision in your favor do? Your Honor, I think that your question may get to what EPA called and the environmental interveners called mootness. And, of course, as you know, defendants have the obligation or respondents have the obligation to show mootness. We don't believe they've done that. All parties agree that the question as to mootness concerns whether this court could provide any effectual relief whatsoever, and that's the established test. We think it's clear that because the environmental petitioners are challenging CASPER equals BART, and, in fact, in their October 30th Rule 28J letter, they specifically reserved the right to challenge EPA's very recent reaffirmation of CASPER equals BART. We face the prospect, our clients face the prospect, of the possibility that CASPER equals BART might go away. We don't think it should. We think it's wholly sustainable. So it's a contingency. Essentially, Your Honor. Yes. I see that my time has expired. Are there any further questions of the Court? Thank you. Ms. Grave, obviously, I want your answer on the contingency. Yes, Your Honor. Well, first of all, Your Honor, it's purely speculative, and it clearly is the Court's. That argument is available whenever you're talking about the contingency. No, that's true, Your Honor. But still, the petitioners have never articulated any real injury that they have suffered from the CARE SIPs being disapproved. There's no injury. They haven't probably had any remedy. Their only remedy is to say, well, if you disapprove the CASPER versus BART rule, perhaps it should be replaced. But that still doesn't make any sense. But isn't there injury in Mr. Grave's reliance? They're saying, we've done this, we've complied, we've stepped up to the line, sir, yes, sir, and now you're telling us to do something different. No, well, they really haven't articulated that argument. But even if they are, it's not warranted for a number of reasons. One, this Court in North Carolina specifically said that CARE was going to have to be replaced. So CARE from day one, when they submitted their SIPs, was clearly a temporary measure. Secondly, so they moved. Despite your saying many times that the improvements under it were permanent. Well, Your Honor, I wanted to get to that point, which is that EPA has only made that statement in the context of states where CARE was replaced by CASPER. It has not ever taken the position, and clearly throughout this litigation we haven't taken the position, that a state that was formerly in CARE but is no longer, in other words, is not replaced by CASPER, that those emission reductions are permanent, because they can't be. Yes, they may have put on controls, but they don't have to run them if there's no regulation, and it costs money to run them, and there's certainly no assumption that a state that was in CARE and is no longer in CARE is going to run them, unless they make some state-specific showing that they have put other regulatory requirements in place. So are you saying that a state that is out of CARE, under your regulation challenged here, could simply adopt regulations enforcing the same behavior that it was doing, that its sources were doing under CARE, and that would take care of it, subject, of course, to the CASPER? Well, they would have to, Your Honor, they would have to make a showing of that. And I think, Your Honor, it's worth looking at. Of the 14 states that EPA disapproved, nine of them were going to be in CASPER and were basically rolled over into CASPER. So EPA promulgated the same action. It disapproved these CARE SIPs. It promulgated federal implementation plans for CASPER for nine of the states. It also, in that federal register notice, said, because at that time CASPER had been stayed, in that federal register notice, EPA specifically stated that it would not make states do anything as long as there was a question about whether CARE was in effect. And while it was in effect, that's on page 22 of the Joint Appendix. So there was no immediate harm. They didn't have to do anything. For nine of those states, EPA promulgated. Subsequently, three states have submitted alternative SIPs, demonstrating through state programs that they believe are an alternative. Two of which EPA has approved and one EPA has proposed for approval. One additional state, EPA has promulgated a federal plan for an in-state program. That's Texas. And there is one state, Mississippi, that EPA is still working with to try and develop a SIP. So the states and EPA have moved on. They've done just what the statute has said. CARE no longer exists in these states. They have to come up with an alternative, and that's what we've moved forward to do. And if the CASPER versus BART, or CASPER better than BART rule was struck down by the court, that's what they would have to do. They'd have to come up with a new plan. All the CASPER states, as well as the states that aren't in CASPER, either do BART or show that some other specific state plan was an adequate alternative to BART. There's contention that Connecticut is getting a free ride, at least relevant to the SIP. Yeah, and that's essentially not true, Your Honor, for a number of reasons. One, the actual approval of the state SIP was made in April of 2013, not in 2014. It was published in 2014 because of a long dispute between the agency and the Office of the Federal Register over something. But it was actually, if you go to the Federal Register notice, you will see that it was signed and thus became into law in 2013, and it was signed in accordance with a district court order, consent decree that required EPA to approve this, to make a decision on the SIP by that date and also said that part of that order was that they could not make any changes, that they had to submit it to the Office of the Federal Register, and they couldn't make any changes to it before it was published, other than editorial changes. So that's one thing. In fact, that approval was signed at the time when CASPER had been vacated by this court and before the Supreme Court's decision. So the second thing is that the Connecticut SIP did not simply say, we're relying on CARE. The Connecticut SIP had a number of state programs, and the one that was for CARE was essentially a small part of the program, a small part of their package of regulatory measures. They had other state measures. It accounted, and number two, the emissions from the state itself are extremely small. And three, EPA, in approving that SIP said, and once CARE is no longer in effect, you have to submit a SIP. So it was a very different time, legally, because it was while CASPER had been vacated. And two, it was a very different kind of analysis. It wasn't just, you cited this CARE rather than BART rule. It was a fact-specific analysis, which is what, in the five years since these SIPs were disapproved, the states and EPA have been doing. And that's why there's no harm and no injury for moving along. Any further questions, gentlemen? Thank you very much. Charlie McFedrin for Conservation Group Petitioners. I just have three quick points I'd like to make. We agree with the government that CARE is dead, with Judge Williams' characterization that CARE is dead and has been superseded. We submit that CARE can't operate besides CASPER. The two programs are different. At JA 541-43, EPA describes in its federal notice differences between the programs and how they would be incompatible. And finally, I'd like to respond to something Mr. Fichthorn said, that if CARE is better than BART and CASPER is better than CARE, then CASPER must be better than BART. I hope I summarized that fairly. We disagree with that because BART is dynamic. EPA itself, in the guidelines in the 2005 rule, describes how over time pollution controls become more cost-effective and more widely available. And we have demonstrated in the record of this case and in our briefs how pollution controls have improved at plants throughout the United States. And we disagree that that syllogism applies here. Thank you. Thank you very much. Thank you. Your Honors, just a few quick points. EPA, I just want to reiterate that EPA never showed in its rulemaking and never asserted in its brief that the control devices installed to achieve CARE reductions would be dismantled or not run. They never have disavowed their statements that those CARE reductions were permanent and enforceable. With respect to Connecticut, we've talked about EPA's approval of Connecticut's CARE equals BART SIP. First of all, Mr. Rave pointed out that the initial approval of that SIP occurred in 2013. But that was at a time when it was unmistakably clear, because CASPER was already on the books, it was unmistakably clear that Connecticut would never be subject to CASPER. So the only emission reductions that could be relied on as a BART alternative were CARE emission reductions for Connecticut. Moreover, again with respect to Connecticut, on July 19, 2013, EPA published a notice in the Federal Register regarding redesignation of southwestern Connecticut from non-attainment to attainment for ambient air quality standards. And EPA said, EPA believes, I'm quoting, EPA believes it is appropriate to allow states to rely on CARE and the existing emission reductions achieved by CARE as sufficiently permanent and enforceable. So there does seem to be some policy that EPA followed that at least Connecticut, which it was clear would never be subject to CASPER, should be entitled to rely on the CARE emission reductions that its sources achieved to satisfy BART under the CARE equals BART alternative. I would also note that Mr. McPhedren noted that CASPER is, quote, I think he used the word dynamic. The fact that he's challenging- I thought he said BART was dynamic. I may have misheard. Yeah, that it was sort of because it's looking at the best available retrofit that's dynamic in a way. I think that the other plans aren't. I may have misheard, but I do want to note that his clients are challenging, obviously they're challenging CASPER equals BART here. They reserve their right to challenge the reaffirmation, the recent reaffirmation of CASPER equals BART, presumably in this court. And I would also note that his clients are challenging SIPs or specific BART SIPs that EPA has proposed to approve for Louisiana for sulfur dioxide. Louisiana is not subject to CASPER for sulfur dioxide. And they're also challenging use of CASPER equals BART for NOx through rulemaking comments for Louisiana and Arkansas. They've also challenged, as this court knows, CASPER equals BART in the Eighth Circuit and in the Third Circuit. There's an ongoing campaign by these parties to strike down use of CASPER equals BART, not only in these present cases, but elsewhere as well. This shows why our clients would like this court to affirm, to make clear that it was inappropriate and improper for EPA to disapprove CARE equals BART SIPs. I thank you for it. Thank you very much. The case is submitted.
judges: Griffith, Pillard, Williams